[Cite as *State v. Stodgel*, 2013-Ohio-1109.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

FAYETTE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO.  CA2012-04-010 |
| | : | O P I N I O N |
| - vs - | | 3/25/2013 |
| | : | |
| BRANDON STODGEL, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM FAYETTE COUNTY COURT OF COMMON PLEAS
Case No. 12CRI0002

Jess C. Weade, Fayette County Prosecuting Attorney, 110 East Court Street, Washington C.H., Ohio 43160, for plaintiff-appellee

Jeffrey E. Buskirk & Associates, Susan R. Wollscheid, 121 West Market Street, Washington C.H., Ohio 43160, for defendant-appellant

**RINGLAND, P.J.**

{¶ 1}  Defendant-appellant, Brandon Stodgel, appeals his convictions in the Fayette County Court of Common Pleas for having weapons while under disability, grand theft, safecracking, and possessing criminal tools.  For the reasons stated below, we affirm.

{¶ 2}  On January 13, 2012, appellant and Michael Newman were arrested by the Fayette County Sheriff's Department for their role in burglarizing two homes.  Police arrested

appellant and Newman after the blue minivan in which they were traveling slid off the road. On January 20, 2012, appellant was indicted for theft, receiving stolen property, having weapons while under disability, two counts of burglary, grand theft, safecracking, and possessing criminal tools. Appellant pled not guilty to all the charges. Prior to trial, the state dismissed the theft charge. Subsequently, a jury trial was held. The testimony at trial centered on events that occurred at two Fayette County homes.

{¶ 3} Ralph Templin testified that on January 13, 2012 he was at his Fayette County home having lunch in his basement. While Templin was eating lunch, he heard a loud noise and someone running across the first floor. Templin grabbed his cell phone, dialed 911, and went upstairs to investigate the noise. When he reached the first floor, he took a kitchen knife and walked to the back of the house. As Templin reached the back of his house, a man came out of one of the bedrooms carrying Templin's brand new coffee pot. Templin yelled at the man. Startled, the man dropped the coffee pot and dove out of a bedroom window. Templin then observed a second man outside, walking past a window. The two men got into a blue minivan and drove away.

{¶ 4} Upon investigation of the exterior of his home, Templin noticed the backdoor was kicked in and the lockset on the door was broken. He also observed two sets of footprints in the snow around his house. Templin described the first man as wearing a sweatshirt and a toboggan. He stated that appellant was not the first man. Templin went on to describe the second man as wearing a "Carhart" jacket, with the hood up. He was unable to see the second man's face but testified that this man was around 5'8" or 5'9" in height. At trial, Templin identified the blue minivan that appellant and Newman were found to be driving as similar to the minivan that was in his driveway.

{¶ 5} Next, Nicholas Gragg testified regarding the burglary of his home on January 13, 2012. Gragg explained that he was at work when he received a call from his security

- 2 -

company in the early afternoon. After the alarm company's notification, Gragg left work and went to his house. Upon arriving at his home, he saw that the front door had been smashed and was propped open by a cinder block. Once Gragg entered the home, he immediately noticed that his large flat screen television and Play Station 3 were missing from the living room. Upon further investigation, Gragg determined that two fire safes and a large gun safe were also missing from his bedroom. Gragg testified that the gun safe was made out of heavy steel, contained six guns, and that he is unable to carry the safe by himself when it is full.

{¶ 6} The responding police officer to the scene was Captain Tony Rose. Rose testified that upon approaching Gragg's home, he immediately noticed that the front doors of the home were open and appeared to be damaged. Inside the home, Rose detected that a television had been removed because the cords and wires attached to the television were still present. Rose also observed that a treadmill located in the master bedroom had been tipped to block entry into the master bathroom, indicating that someone had tampered with items in that room as well. Rose acknowledged that no fingerprints were taken at the home as he checked the surfaces in the home and was unable to find any good prints.

{¶ 7} Next, a few local residents testified that they found the fire safes and gun safe on the side of the road. Two women testified that they were driving down a road in Fayette County when they saw a blue minivan. The women thought the minivan was suspicious as it was traveling much slower than the speed limit. The women testified that the driver of the van was wearing a "Carhart" jacket and identified appellant as the driver of the vehicle. After passing the van, the pair saw a black steel box lying in the ditch. A little while later, one of the women passed the box again, picked it up, and notified the Fayette County Sherriff. Additionally, a witness testified that she found two fire safes in a ditch along a Fayette County road and gave them to the Fayette County Sheriff's Department.

{¶ 8} After the burglaries of the homes of Templin and Gragg, the Fayette County Sheriff's Department started patrolling the area for an older blue minivan with two men inside. While investigating a van at a local residence, Sergeant McFarland observed a blue van travel past the officers that matched the witnesses' descriptions perfectly. The officers entered their marked cruisers and began pursuing the vehicle. Moments after the police began following the van. The driver of the van accelerated and lost control. The van then slid off the road into a snowy field.

{¶ 9} The officers approached the vehicle and ordered the men out of the van. Sheriff Stanforth observed that appellant was the driver of the vehicle and wearing a "Carhart" jacket. A large flat screen television, several guns, a hatchet, a screwdriver, and a hypodermic needle were found in the van. Later that night, police received the fire safes and gun safe. A Fayette County Sheriff Deputy testified that all the safes appeared to have been forced open and that the big safe had to be picked up by two officers.

{¶ 10} The last witness to testify was appellant's co-defendant, Matthew Newman. Newman explained that he is currently in prison for the burglaries of the homes of Templin and Gragg. Newman stated that a few days after he was arrested he spoke with Sergeant McFarland. During this conversation, Newman denied participation in the burglaries and told McFarland that appellant was the one who committed the offenses. Specifically, Newman explained that on January 13, 2012, he and appellant were at appellant's father's house when appellant asked him if he wanted to "take a ride." During the ride, the pair arrived at Templin's house and appellant knocked on the front door. When no one answered, appellant broke into the back door. Newman also stated that appellant was involved in the burglary at Gragg's home. He explained that appellant was the one who threw the cinder block into the front door of the home. During the interview, Newman admitted that he was present during the burglaries and he went into both Templin's and Gragg's homes.

{¶ 11} However, on the stand, Newman testified that the story he told McFarland was a lie. Newman explained that he told McFarland a false story because he was addicted to heroin and he was "dope sick" because he had not had the drug for a few days. Therefore, he stated that he told McFarland what he wanted to hear because he thought he would be able to get out of jail and obtain some drugs. Newman stated that on the day of the robberies he told appellant that he needed to go to his aunt's house and get some clothes. In actuality, Newman wanted to rob some homes so that he could obtain money to buy drugs. Newman then drove to Templin's home and told appellant to wait in the car while he picked up some clothes from his aunt. Newman then proceeded to break into Templin's house while appellant was in the vehicle. Sometime during the robbery, appellant grew impatient and got out of the van to check on Newman. When appellant got out of the van, Templin came out of his basement and scared Newman. Newman dove out of the window, told appellant that his aunt was "flipping out on him," and that they needed to hurry and get out of there. The pair then left in the blue minivan.

{¶ 12} Newman testified that after leaving the residence, he told appellant that he needed some dope, so he was going to "hit a lick" to obtain some money. After hearing this information, appellant became angry, left the vehicle, and started walking down the road. Newman then went to Gragg's home and burglarized the home on his own. After the burglary, Newman came upon appellant walking down the road and offered him a ride home. Appellant no longer trusted Newman and insisted on driving to ensure he would go straight home. During this time, Newman used a hatchet and screwdriver to pry open the safes and empty them. While appellant was driving, Newman threw the safes out of the van into the ditch. Subsequently, the van slid off the road and Newman and appellant were arrested.

{¶ 13} At the close of the state's case, the trial court sua sponte amended count six of the indictment. Count six was amended from R.C. 2913.02(A)(2) to R.C. 2913.02(A)(1).

{¶ 14} After the presentation of all the witnesses, a unanimous jury found appellant guilty of having weapons while under disability, grand theft, safecracking, and possession of criminal tools. The jury found appellant not guilty of two counts of burglary and receiving stolen property. Appellant was sentenced to an aggregate prison term of eight years, ten months, and eight days.

{¶ 15} Appellant now appeals, asserting two assignments of error. We will begin with appellant's second assignment of error.

{¶ 16} Assignment of Error No. 2:

{¶ 17} TRIAL COURT ERRED BY SUA SPONTE AMENDING COUNT SIX OF THE INDICTMENT, THEREBY CHANGING THE NATURE OF THE CRIME IN VIOLATION OF APPELLANT'S RIGHTS.

{¶ 18} Appellant argues that the trial court erred when it amended count six of the indictment from R.C. 2913.02(A)(2) to R.C. 2913.02 (A)(1). Appellant asserts that this was in error as the amendment changed the "identity" of the crime charged.

{¶ 19} We first note that appellant failed to object to the trial court's amendment of the indictment. Accordingly, appellant has waived all but plain error on appeal. *State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, ¶ 26. Plain error is present only if the error is obvious and, but for the error, the outcome of the trial clearly would have been different. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 108.

{¶ 20} Crim.R. 7(D) provides,

[t]he court may at any time before, during, or after a trial amend the indictment, information, complaint, or bill of particulars, in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence provided no change is made in the name or identity of the crime charged.

{¶ 21} A trial court commits reversible error when it permits an amendment to the indictment that changes the "name" or "identity" of the crime charged. *State v. Fairbanks*,

- 6 -

172 Ohio App.3d 766, 2007-Ohio-4117, ¶ 21 (12th Dist.). This amendment is unlawful whether or not the defendant was granted a continuance to prepare for trial. *Id.* at ¶ 17. Additionally, a defendant need not demonstrate that he has suffered any prejudice as a result of the forbidden amendment. *Id.*

{¶ 22} Determining whether the "name" of a crime is changed is a relatively simple proposition. Where the amendment does not change the "name" of the crime, Crim.R. 7(D) is not violated regarding that prohibition. *State v. Craft*, 181 Ohio App.3d 150, 2009-Ohio-675, ¶ 23 (12th Dist.). On the other hand, an inquiry into whether the "identity" of a crime has been changed requires a more searching analysis. To determine if the "identity" of a crime has changed, the court must examine whether the "penalty or degree" changed. *State v. Stacey*, 3rd Dist. No. 13-08-44, 2009-Ohio-3816, ¶ 9. The "identity" of a crime also changes when an indictment is so amended that the offense alleged in the indictment and the offense alleged in the amended indictment contain different elements that require independent proof. *State v. Collinsworth*, 12th Dist. No. CA2003-10-012, 2004-Ohio-5902, ¶ 20.

{¶ 23} The "identity" of a crime does not change when a court is simply correcting a clerical error even though the amendment changed an element in the offense. *Stacey* at ¶ 10. In *Stacey*, the court found plain error did not exist when the trial court amended the indictment to delete language stating the victim was the offender's spouse at the time of the rape because it was factually and legally impossible for the defendant and the victim to be married. *Id.* *See Columbus v. Cordova*, 10th Dist. No. 11AP-602, 2012-Ohio-1812 (finding identity of traffic offense did not change when defendant had notice regarding the amended offense).

{¶ 24} On the other hand, the "identity" of a crime is changed when a court is not merely correcting a clerical mistake but instead modifying the elements of the crime. *State v. Woody*, 29 Ohio App.3d 364 (1st Dist.1986). In *Woody*, the court held that a trial court erred

when it amended an indictment from a charge of theft under R.C. 2913.02(A)(1) to R.C. 2913.02(A)(2). Notably, neither side alleged that the amendment was correcting a clerical error, instead the defendant believed he was charged under subsection (A)(1) until the court amended the indictment after defense counsel's closing argument. *Id.* at 646.

{¶ 25} Shortly before the close of the state's case, the trial court sua sponte amended the indictment from R.C. 2913.02(A)(2) to R.C. 2913.02(A)(1). R.C. 2913.02 provides,

> (A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
>
> (1) Without the consent of the owner or person authorized to give consent.
>
> (2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent.

{¶ 26} On the cover page of appellant's indictment, he was charged with committing grand theft in violation of R.C. 2913.02(A)(2). However, the body of the indictment contained language from R.C. 2913.02(A)(1). Specifically, the body of the indictment stated,

> *Count Six*
>
> On or about January 13, 2012, and in Fayette County, Ohio, the [appellant] did, with purpose to deprive Nicholas Gragg, the owner of property or services, to wit * * * *knowingly obtain or exert control over said property without the consent of Nicholas Gragg*, the owner or person authorized to give consent, and the items being firearms or dangerous ordnance; in violation of Section 2913.02 of the Revised Code. (Emphasis added.)

{¶ 27} Additionally, count six of the bill of particulars specified that appellant violated R.C. 2913.02 by "*knowingly obtain[ing] or exert[ing] control over said property without the consent of Nicholas Gragg.*" (Emphasis added.) At trial before the amendment of the indictment, both defense counsel's and the state's opening arguments and the state's presentation of its case focused on whether appellant exercised unlawful control over Gragg's property. Notably, neither side alleged that appellant obtained consent to use

Gragg's firearms and then went beyond that consent.

{¶ 28} We find that the trial court did not commit plain error in amending the indictment from R.C. 2913.02(A)(2) to R.C. 291302(A)(1). Appellant was not prejudiced by the amendment because he clearly had notice that the state was proceeding under (A)(1). While the cover page of appellant's indictment stated the wrong subsection of R.C. 2913.02, the body of the indictment and the bill of particulars notified appellant that that the state alleged he took property without the consent of the owner in violation of (A)(1). Additionally, defense counsel's opening statement showed that he was notified of proceeding under (A)(1) as he argued that appellant was never at Gragg's home, not that appellant's use of the Gragg's property exceeded Gragg's permission. Lastly, appellant was not prejudiced by the amendment because there was no evidence to show that Gragg gave appellant permission to use the guns and that appellant simply went beyond the scope of that consent.

{¶ 29} We also find *Woody* distinguishable as there was no discrepancy in that case between the cover page of the indictment and the body of the indictment. Unlike *Woody*, appellant was notified that the state was proceeding under (A)(1). In this case, it was clear that the trial court was correcting a clerical error. Additionally, unlike *Woody* we review the trial court's decision under a plain error analysis.

{¶ 30} Therefore, the trial court's amendment of the indictment was not plain error. Appellant's second assignment of error is overruled.

{¶ 31} Assignment of Error No. 1:

{¶ 32} THE TRIAL COURT VIOLATED THE APPELLANT'S RIGHTS UNDER THE CONSTITUTION OF THE UNITED STATES AND THE STATE OF OHIO BY SUSTAINING A CONVICTION THAT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND WITHOUT SUFFICIENT EVIDENCE.

{¶ 33} Appellant argues that his convictions for having weapons while under disability,

grand theft, safecracking, and possessing criminal tools were not supported by sufficient evidence and were against the manifest weight of the evidence. Specifically, appellant maintains that the state failed to show that he "possessed" the firearms, safes, or criminal tools. Additionally, appellant argues there was no evidence that the firearms were operable.

{¶ 34} As this court has previously stated, "a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency." *State v. Wilson*, 12th Dist. No. CA2006-01-007, 2007-Ohio-2298, ¶ 35. In turn, while a review of the sufficiency of the evidence and a review of the manifest weight of the evidence are separate and legally distinct concepts, this court's determination that appellant's conviction was supported by the manifest weight of the evidence will be dispositive of the issue of sufficiency. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

{¶ 35} A manifest weight challenge concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. *State v. Clements*, 12th Dist. No. CA2009-11-277, 2010-Ohio-4801, ¶ 19. A court considering whether a conviction is against the manifest weight of the evidence must review the entire record, weighing the evidence and all reasonable inferences, and consider the credibility of the witnesses. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 39. However, while appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, these issues are primarily matters for the trier of fact to decide since it is in the best position to judge the credibility of the witnesses and the weight to be given to the evidence. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Therefore, the question upon review is whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Good*, 12th Dist. No. CA2007-03-082, 2008-Ohio-4502, ¶ 25.

{¶ 36} To be guilty of having weapons while under disability in violation of R.C. 2923.13(A)(2), the state must show that the defendant, "knowingly acquire[d], *ha[d], carr[ied],* or use[d] any firearm or dangerous ordnance" and that the defendant "has been convicted of any felony offense of violence."[1] (Emphasis added.) A person is guilty of grand theft if that person, "with purpose to deprive the owner of property * * * shall knowingly *obtain or exert control* over" "the property" "without the consent of the owner or person authorized to give consent." (Emphasis added.) R.C. 2913.02(A)(1). The offense rises to grand theft "if the property stolen is a firearm or dangerous ordnance." *Id.* at (B)(4).

{¶ 37} Safecracking is defined as, "[n]o person, with purpose to commit an offense, shall knowingly enter, force an entrance into, or tamper with any vault, safe, or strongbox." R.C. 2911.31(A). Lastly, an individual is guilty of possessing criminal tools if that person *"possess[es] or ha[s] under the person's control* any substance, device, instrument or article, with purpose to use it criminally." (Emphasis added.) R.C. 2923.24(A). "Possession or control of any substance, device, instrument, or article commonly used for criminal purposes, under circumstances indicating the item is intended for criminal use." *Id.* at (B)(3).

{¶ 38} First, we address appellant's contention that his convictions were against the manifest weight of the evidence because there was no evidence to establish that he "possessed" the firearms, safes, or criminal tools. To begin with, appellant's co-defendant, Newman, implicated appellant in all the events that occurred on January 13, 2012 and established that appellant possessed the firearms, safes, and criminal tools. During Newman's police interview, he stated appellant was involved in the burglaries of Templin's and Gragg's homes and the subsequent offenses that occurred. Newman denied being

---

1. We note that in the judgment entry the trial court stated that appellant was guilty of R.C. 2923.13(A)(3). As appellant does not argue this on appeal and during all other stages of the proceeding appellant was charged with R.C. 2923.13(A)(2), we find that this is a clerical or scrivener's error.

involved in the burglaries and stated that the offenses were appellant's idea. On the stand, Newman repudiated this statement and explained an elaborate and convenient story that involved appellant leaving the van during the second robbery only to get in the vehicle right before police discovered the pair.

{¶ 39} Other evidence also showed appellant "possessed" these items. The victim of the second home burglary explained that several items that were stolen from him were very heavy and would require two people to lift them. Also, a witness who saw a blue van driving very slowly identified appellant as the driver. The witness explained that shortly after the van passed, she found Gragg's empty gun safe which had been broken into on the side of the road. The two fire safes were also found in a ditch on a different road. Further, Sheriff Stanforth testified that he observed a van that matched a witness' description of the van involved in the burglaries. After a marked police vehicle began following the van, the driver of the van sped up, lost control, and crashed in a field. Police discovered appellant driving the van. Inside the van, police saw the guns, which were once stored in Gragg's gun safe, and a television. Additionally, a screwdriver and a hatchet were located near the passenger's seat in the van. Thus, the manifest weight of the evidence shows that appellant possessed the firearms, safes, and criminal tools.

{¶ 40} Next, we address appellant's argument that his convictions for having weapons while under disability and grand theft were against the manifest weight of the evidence because the state failed to show that the firearms were operable. Both offenses of grand theft and having weapons while under disability require that the defendant have a "firearm or dangerous ordinance." R.C. 2923.13(A); R.C. 2913.02(B)(4). Firearm is defined as "any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. 'Firearm' includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable." R.C. 2923.11(B)(1). *See* R.C.

- 12 -

2913.01(EE). "Deadly weapon" is defined as any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon. R.C. 2923.11(A).

{¶ 41} Proof of operability of a firearm "can be established beyond a reasonable doubt by the testimony of lay witnesses who were in a position to observe the instrument and the circumstances surrounding the crime." *State v. Murphy*, 49 Ohio St.3d 206 (1990), syllabus. *See* R.C. R.C. 2923.11(B)(2). Although test firing a firearm can establish its operability, courts have found many types of circumstantial evidence to be sufficient to establish operability. The testimony of a gun shop owner that the firearms stolen from his gun shop were capable of firing a projectile by the action of an explosive or combustible propellant was sufficient to show that the guns were operable even though they were not test fired. *State v. Hughes*, 3rd Dist. No. 1-94-81 (June 29, 1995). Additionally, where the owner of the guns testified that he had fired the firearms prior to trial and police test fired a few of the stolen guns, the evidence was sufficient to show that the guns were operable. *State v. Hous*, 2nd Dist. No. 02-CA-116, 2004-Ohio-666, ¶ 40.

{¶ 42} We find that the manifest weight of the evidence showed that the firearms were operable at the time appellant possessed them. At trial, Gragg testified that several guns were stolen from his home. He explained that after he received these guns from police, he successfully fired every firearm. Additionally, Gragg stated that several of the firearms fired successfully a few months before the burglary. Accordingly, the manifest weight of the evidence established that the firearms were operable.

{¶ 43} Thus, the manifest weight of the evidence established that appellant "possessed" the firearms, safes, and criminal tools and that the firearms were operable. Additionally, the manifest weight of the evidence established all other elements of appellant's convictions. Appellant's first assignment of error is overruled.

- 13 -

{¶ 44} Judgment affirmed.

S. POWELL and M. POWELL, JJ., concur.